**ROTHERY STORAGE & VAN CO., et al., Plaintiffs,**

v.

**ATLAS VAN LINES, INC., Defendant.**

**Civ.A. No. 83–0450.**

United States District Court, District of Columbia.

Oct. 30, 1984.

As Corrected Nov. 9, 1984.

---

C. Jack Pearce, Robert J. Gallagher, Keith I. Clearwaters, Washington, D.C., for plaintiffs; Timothy J. Shearer, Washington, D.C., of counsel.

James vanR. Springer, R. Bruce Holcomb, Washington, D.C., for defendant.

## MEMORANDUM

OBERDORFER, District Judge.

This is a private antitrust action brought pursuant to Section 1 of the Sherman Act, 15 U.S.C. § 1 (1982), against Atlas Van Lines, Inc. ("Atlas"), a nationwide van line company.[1] Plaintiffs are ten present and former agents of Atlas. They challenge an Atlas policy—made effective in August, 1983—under which Atlas announced that it would terminate its agency relationship with any agent that maintained independent operations in the interstate moving business unless the agent transferred its independent authority to do so to a separate and distinct (albeit affiliated) company. The case is presently before the Court both on defendant's motion for summary judgment and on plaintiffs' motion for partial summary judgment as to liability. After careful consideration of undisputed facts developed after extensive discovery and set out pursuant to Fed.R.Civ.P. 56 and Local Rule 1–9(h), as well as the arguments advanced by the parties in their memoranda and at oral argument, the Court concludes that, for the reasons set forth below, plaintiffs' motion for partial summary judgment as to liability must be denied, and defendant's motion for summary judgment must be granted.

### I.

This lawsuit involves, in essence, the legality of Atlas's response to the regulatory and commercial changes resulting from the deregulation of the household goods moving industry in 1980. A brief overview of Atlas's methods of operation and of the recent changes in the industry is necessary to an understanding of the nature of the claims at issue.

Defendant Atlas Van Lines holds authority from the Interstate Commerce Commission ("ICC") to transport goods from state to state on a nationwide basis. Statement of Material Undisputed Facts in Support of Plaintiffs' Motion for Partial Summary

---

**1.** In their complaint, filed February 17, 1983, plaintiffs also named the Interstate Commerce Commission ("ICC") as a party-defendant. Plaintiffs requested—as a predicate to certain further relief against the ICC—that the Court compel the ICC to reach a decision on a related matter pending before the agency. In light of intervening developments and upon motion by the ICC, the Court on May 26, 1983 dismissed the action against the ICC as moot. *See* Order of May 26, 1983. The ICC is thus no longer a defendant in this suit.

Judgment As To Liability ¶ II–A (hereinafter "PSF" . ["Plaintiffs' Statement of Facts"]); Defendant's Response to Plaintiffs' Statement of Material Undisputed Facts ¶ II–A (hereinafter "DRPF" ["Defendant's Response to Plaintiffs' Facts"]); Defendant's Statement of Material Facts As To Which There Is No Genuine Issue ¶ 1 (hereinafter "DSF" ["Defendant's Statement of Facts"]); Plaintiffs' Statement of Genuine Issues ¶ 1 (hereinafter "PSGI").[2] As has been typical of the operation of other national van lines, Atlas exercises this authority primarily through a group of "agent" moving companies around the country. These "agent" companies are independent entities that have entered into standardized "Agency Agreements" with Atlas to carry out interstate shipments under Atlas's authority, PSF ¶¶ II–C, V–P, DRSF ¶¶ II–C, V–P, Plain-

tiffs' Appendix I (hereinafter "Plaintiffs' App."), and that agree—in making Atlas shipments—to abide by the operating procedures, painting and maintenance standards, and uniform rates, *inter alia,* provided for by the Agency Agreement. *See* PSF ¶¶ V–O—V–X; DRPF ¶¶ V–O—V–X; DSF ¶¶ 2–13; PSGI ¶ 2–13. In addition, representatives of some of Atlas's agent companies sit on the Atlas board of directors, PSF ¶ II–K, V–A; DRPF ¶¶ II–K, V–A—a practice that has been typical in the industry during many years of ICC oversight, *see* S.Rep. No. 497, 96th Cong., 1st Sess. 8 (1979); H.Rep. No. 1372, 96th Cong., 1st Sess. 10 (1979), and that won express legislative immunity from the federal antitrust laws—as described below— with the enactment of 49 U.S.C. § 10934(d) in 1980.[3] Nonetheless, the agent compa-

**2.** Plaintiffs' "Statement of Genuine Issues" purports to dispute a number of material facts asserted by defendant. Close comparison of plaintiffs' assertions discloses that while many of them challenge the implications or characterizations of defendant's statements, they do not effectively traverse them so as to put material facts into genuine dispute. For example, plaintiffs state that they cannot "accept[ ] as undisputed" the statement by defendant that "Atlas headquarters directs and coordinates [certain] agent activities." PSGI ¶ 4, at 10–11. Plaintiffs, thus, object that Atlas does not " 'direct' the performance of origin or destination services, *in any direct supervisory sense." Id.* (emphasis added). As suggested by the qualification at the end of the quotation, though, plaintiffs fail to dispute that Atlas does indeed have the authority to set the general terms according to which Atlas agents perform these functions for Atlas. And indeed, plaintiffs concede that "Atlas does coordinate the movement of trucks, to a substantial degree." *Id.* at 11. Throughout this memorandum, in citing to corresponding portions of plaintiffs' and defendant's factual pleadings, the Court relies on the assertions therein to the extent that they reveal areas of agreement as described above, while disregarding any specific facts as to which the parties have succeeded in raising a genuine issue.

**3.** The validity of the Atlas policy at issue in this case involves consideration of two separate statutory immunity provisions: 49 U.S.C. §§ 11341–11342 (1982), and 49 U.S.C. § 10934(d) (1982). The first of these provisions, 49 U.S.C. §§ 11341–11342, has relevance to the van line practice, described *infra* at pages 221–222, of allowing some agents (referred to as "carrier-agents")

to possess and exercise their own independent interstate ICC authority in addition to acting as agents for the van line. Coordination between a van line and its carrier-agents has, under 49 U.S.C. §§ 11341–11342, long been immune from the federal antitrust laws provided that the van line and its carrier-agents enter into a "pooling agreement" meeting ICC approval. *See infra* at page 221. There is no dispute in this case as to the immunity provided by this provision.

The second provision, 49 U.S.C. § 10934(d), was enacted in 1980 as part of Congress's deregulation of the household goods moving industry, *see* Pub.L. 96–454, § 5(a)(1), 94 Stat. 2013 (1980), and it is this provision that addresses, *inter alia,* the membership on a van line's board of directors of the van line's own agents. Plaintiffs do not dispute that, under the statute, the fact of such membership is immune from antitrust challenge. *See* Plaintiffs' Memorandum in Opposition to Defendant's Motion for Summary Judgment at 18. Yet the further scope of this immunity provision is disputed, and is discussed in detail *infra* at pages 226–228, 229. The provision reads, in its entirety:

The antitrust laws, as defined in the first section of the Clayton Act (15 U.S.C. 12), do not apply to discussions or agreements between a motor common carrier providing transportation of household goods subject to the jurisdiction of the [Interstate Commerce] Commission under subchapter II of chapter 105 of this title and its agents (whether or not an agent is also a carrier) related solely to (1) rates for the transportation of household goods under the authority of the principal carrier, (2) accessorial, terminal, storage, or other charges for services incidental to the

nies in the field remain wholly independent from Atlas itself and interact with Atlas in accordance with standard contractual arrangements. PSF ¶ V–P, DRPF ¶ V–P.

It has also been common in the industry, in addition, for many agent companies to hold their own, separate interstate authority from the ICC. *E.g.*, PSF ¶¶ I–E, I–G; DRPF ¶¶ I–E, I–G; *see Practices of Motor Common Carriers of Household Goods (Agency Relationships)*, 115 M.C.C. 628, 629 (1972) (hereinafter referred to as *"Practices"*). Agent companies that hold such independent authority in their own right are termed "carrier-agents"; agents that hold no such independent authority are termed "non-carrier" agents. *Practices, supra,* at 629. While a non-carrier agent accepts shipments solely as an agent for the principal van line that it serves, a carrier-agent has more flexibility. It may, like a non-carrier agent, accept shipments for carriage on the account of its principal carrier. But a carrier-agent may also accept certain shipments for carriage on its own account—rather than that of the principal carrier for which it serves as an agent—when the distance of the shipment does not exceed the geographic range of its independent authority and when other factors render it profitable for the carrier-agent to do so. *E.g.* PSF ¶¶ V–H—V–J; DRPF ¶¶ V–H—V–J; *see Practices, supra,* at 629. A carrier-agent, in this fashion, simultaneously functions both as an agent of the principal van line that it serves, and, on certain shipments, as one of the van line's competitors, in that it may shift to its independent account certain shipments that might otherwise have been carried on the van line's account. *E.g.* PSF ¶¶ V–G, V–I; DSF ¶ 22; PSGI ¶ 22; *see Practices, supra,* at 629. Some carrier-agents, moreover, enjoy the distinct benefit of using van line personnel, van line uniforms and equipment (with van line insignia), and van line

origin and destination services even on shipments carried out on their own, independent authority, *e.g.*, DSF ¶¶ 24–29; PSGI ¶¶ 24–29; *see* Plaintiffs' App. G, and thus can avoid the costs of building the business infrastructure necessary to exercising their independent carrier authority effectively. *See* DSF ¶ 27; PSGI ¶ 27. Atlas carrier-agents, for example, enjoyed this latter benefit prior to the events at issue in this lawsuit. DSF ¶¶ 24–29; PSGI ¶¶ 24–29.

Federal law has long given special immunity from the antitrust laws to carrier-agent relationships, but only if 1) the van line and its carrier-agents enter into a "pooling agreement" that spells out the division of business, sharing of facilities, and other terms according to which the van line will allow its "agents" to compete with it, and 2) the pooling agreement meets ICC approval. *See* 49 U.S.C. §§ 11341–11342 (1982); *Practices, supra,* at 633. Significantly, a pooling agreement may be terminable unilaterally by either the national van line or its carrier-agents, and the exercise of this option eliminates the automatic antitrust immunity that a carrier-agent relationship otherwise enjoys. *See* DSF ¶ 24; PSGI ¶ 24. Atlas entered into a pooling agreement in 1957, which set the terms according to which, thereafter, it allowed its agents to acquire and operate their own independent ICC authority. DSF ¶ 24; PSGI ¶ 24. Other van lines, by contrast, have declined to enter into pooling agreements at all, and indeed have traditionally chosen to employ only non-carrier agents. *E.g.*, PSF ¶ III–I; DRSF ¶ III–I. Representatives of carrier-agents—where the van line uses them—may sit on a van line's board of directors just as do representatives of non-carrier agents, both pursuant to prior practice, *e.g.*, PSF ¶ V–A; DRPF ¶ V–A, and under the more recently enact-

---

transportation of household goods transported under the authority of the principal carrier, (3) allowances relating to transportation of household goods under the authority of the principal carrier, and (4) ownership of a motor common carrier providing transportation

of household goods subject to the jurisdiction of the Commission under subchapter II of chapter 105 of this title by an agent or membership on the board of directors of any such motor common carrier by an agent.
49 U.S.C. § 10934(d) (1982).

ed federal antitrust exemption contained in 49 U.S.C. § 10934(d) (1982).[4]

Finally, it is a central feature of the van line industry that agents within a van line's infrastructure often must agree to provide their services only to that particular van line and to other agent companies within the van line's network. *See, e.g.*, PSF ¶ V–Q; DRPF ¶ V–Q; Plaintiffs' App. G. As in many other industries, "exclusive dealing" is a common method of operation. *See* Plaintiffs' App. G, at 1–3. For van lines that have exclusive dealing arrangements and that utilize only non-carrier agents, thus, only shipments on the van line's own account are carried within the van line's infrastructure. For van lines that have exclusive dealing arrangements and that use carrier-agents as well as non-carrier agents, however, non-van line shipments originating from the carrier-agents' independent operations may be carried within the van line's infrastructure as well. The establishment of such arrangements for the benefit of a van line's carrier-agents is a matter of voluntary accommodation on the part of the van line—though once established, it may be governed by the van line's ICC-certified pooling agreement. *See, e.g.*, DSF ¶ 24; PSGI ¶ 24; *see Practices, supra*, at 633. Nonetheless, almost no van line, apparently, allows the agents within its network regularly to handle the traffic of any company that is not also one of the van lines' agents. *E.g.*, DSF ¶ 22; PSGI ¶ 22; *see* Plaintiffs' App. G.[5]

Prior to the deregulation of the moving industry beginning around 1979, the extent to which agents could and did make use of independent ICC authority—if their van lines allowed them to do so at all—was limited. DSF ¶ 23; PSGI ¶ 23. First, then-existing ICC regulations made it very difficult for non-carrier agents to obtain, or for existing carrier-agents to augment, their own interstate authority. DSF ¶ 35; PSGI ¶ 35. Second, even for agents that did possess such authority, it was usually—due to ICC regulations—of limited geographic scope. DSF ¶ 35; PSGI ¶ 35. Most important, the ICC required that carrier-agents use the same rates for their "independent carrier" shipments as for their "agency" shipments—that is, price competition between van lines and the independent operations of their carrier-agents was expressly barred. DSF ¶ 36; PSGI ¶ 36.

The advent of deregulation in the moving industry represented a dramatic change in these business circumstances. With deregulation, agents could obtain independent interstate authority or expand existing interstate authority quite easily. DSF ¶ 35; PSGI ¶ 35. By the same token, independent carriers and local moving companies wishing to offer interstate service could readily obtain their own interstate authority rather than associating with a national van line in order to do so. Also, the ICC no longer imposed narrow geographic limits on the scope of such new authority. Agents, as well as independent carriers, could obtain authority allowing them to carry goods on their own account not only locally, but regionally or even nationally as well. *See* DSF ¶ 35; PSGI ¶ 35. Moreover, and perhaps most significantly, the ICC abandoned the rule that carrier-agents were required to charge identical rates on their agency and non-agency shipments. DSF ¶ 36; PSGI ¶ 36.

Thus, as a result of deregulation, Atlas faced the prospect of potential Atlas shipments being shifted to independent carrier-agent accounts 1) by many more agents than before, 2) on long distance hauls as well as local hauls, and 3) with greater frequency due to newly authorized price competition from its carrier-agents in their

---

**4.** *See supra* note 3.

**5.** Agent operations for handling government or military traffic or exercising freight forwarding authority as referred to at PSGI ¶ 22 constitute separate categories of business carried out under separate ICC authorities. *See Atlas Van Lines, Inc., et al.—Pooling Application,* ICC Docket No. MC–F–15004 at 1–5 (July 15, 1983) (Defendant's Evidentiary and Other Materials 17). While such shipments may also be carried within a van line's infrastructure, operations under these ancillary authorities are not affected by the Atlas policy being challenged in this suit and thus are not at issue.

independent capacities. *See* PSF ¶¶ VI–V —VI–X; DRPF ¶¶ VI–V—VI–X. Atlas carrier-agents, nevertheless, continued to reap a substantial benefit from the use of the Atlas infrastructure—including Atlas-leased trucks, Atlas-trained personnel, Atlas uniforms, and the extremely valuable Atlas origin and destination network—on their own, independent, non-Atlas hauls. *See* DSF ¶¶ 24–29; PSGI ¶¶ 24–29. After deregulation, moreover, this practice threatened to saddle Atlas with significant liability problems: as part of the deregulation of the industry, Congress made national van lines expressly liable for actions committed by an agent when the agent is operating "within the actual or *apparent* authority" of its principal ·van line. 49 U.S.C. § 10934(a) (1982). Thus, to the extent that the independent shipments of Atlas's carrier-agents were often carried out with many of the trappings of an official Atlas shipment, the new liability provision placed Atlas at an enhanced, statutory risk of being held legally responsible for those non-Atlas shipments. *See* DSF ¶¶ 31–34; PSGI ¶¶ 31–34.

Atlas initiated several policies in anticipation of and in response to the changes accompanying deregulation, though it aborted each of these initiatives in turn until it finally settled on the policy at issue in this suit.[6] On February 11, 1982, Atlas announced that it planned to exercise its right to cancel its pooling agreement, and that it would terminate its relationship with any agent company[7] that continued to operate an independent, interstate authority for its own account in addition to serving as an Atlas agent. PSF ¶¶ VI–K—VI–P; DRPF ¶¶ VI–K—VI–P. In effect, the policy meant that Atlas would thenceforth deal only with "non-carrier" agents. PSF ¶ VI–N; DRPF ¶ VI–N. Atlas indicated that its existing carrier-agents could retain their independent authority without being terminated as Atlas agents only if they transferred that authority to a separate corporation to be operated under a new and distinct name. PSF ¶¶ VI–N—VI–P; DRPF ¶¶ VI–N—VI–P; DSF ¶¶ 52–53; PSGI ¶¶ 52–53. Under the policy, the separate company could remain legally "affiliated" with the agency company—that is, both companies could remain under common ownership. However, the separate company would be outside the Atlas network: it would generally not have access to Atlas origin and destination services provided by other Atlas agent companies around the country, PSF ¶ VI–M; DRPF ¶ VI–M, in that Atlas agent companies were contractually barred from providing such services for the shipments of non-Atlas companies to the extent that doing so would "infringe upon the exclusivity of representation which is a part of the agency agreement." PSF ¶ VI–N; DRPF ¶ VI–N.

---

**6.** *See infra* note 22. The successive initiatives were:

 a) *January 27, 1979.* Atlas began to require that carrier-agents pay to Atlas one percent of their revenues from the use of their independent authorities, in compensation for the benefits they received from Atlas in aid of their independent operations. This requirement remained in effect until the last quarter of 1979. PSF ¶¶ VI–A—VI–B; DRPF ¶¶ VI–A—VI–B.

 b) *January 27, 1979.* Atlas announced a policy—effective immediately—prohibiting an agent from acquiring any new interstate authority or applying to add to his present interstate authority. Atlas states that despite its threats, it never enforced this policy, and publicly abandoned the policy by November, 1980. PSF ¶¶ VI–A, VI–C—VI–D; DRPF ¶¶ VI–A, VI–C—VI–D; DSF ¶ 45; PSGI ¶ 45.

 c) *November 1, 1980.* Atlas approved a tentative plan to purchase the independent authorities of its carrier-agents. The plan was soon abandoned without implementation. PSF ¶¶ VI–F—VI–G; DRPF ¶¶ VI–F—VI–G.

 d) *March 20, 1981.* Atlas announced a plan that allowed agents freely to hold, increase, and use independent authority (without necessarily setting up a separate carrier company), but that banned any use of Atlas agents for origin and destination services in connection with shipments under such independent authority. The plan was implemented on May 1, 1981. After ICC objection that the plan required a new pooling agreement, the plan was abandoned on May 21, 1981. PSF ¶¶ VI–H—VI–J; DRPF ¶¶ VI–H—VI–J.

**7.** Atlas's Agency Agreements state that they are terminable by either party upon thirty days notice "without cause." PSF ¶ V–Q; DRPF V–Q; Plaintiffs' App. I.

Announcement of the new Atlas policy and its imminent implementation predictably triggered a challenge before the Interstate Commerce Commission. On August 16, 1982, in response to this challenge, the ICC *inter alia* affirmed Atlas's right to withdraw from its pooling agreement, holding that "nothing in [the] existing modified pooling agreement precludes withdrawal by any party from the agreement." *Atlas Van Lines, Inc.—Pooling*, ICC Docket No. MC–F–14784, Finance Docket No. 29972 at 3 (August 16, 1982) (Appendix A to Second Amended Complaint). On February 17, 1983, moreover, the ICC announced that the new arrangement proposed by Atlas did not require a new pooling agreement:[8] the ICC held that because the independent authority to be retained by the agents would be transferred to an entirely separate competitive entity outside of the Atlas network, no "pooling" between competitive carriers would be taking place and thus no pooling agreement was necessary. *Atlas Van Lines, Inc.—Pooling*, ICC Docket No. MC–F–14784, Finance Docket No. 29972 at 8–11 (February 17, 1983) (Appendix B to Answer to Second Amended Complaint).[9]

Soon after Atlas announced its new policy, it contacted all of its agents by mail and asked them to respond by signing a form indicating whether or not they would comply with the new requirements for Atlas agency. PSF ¶¶ VI–S, VI–U; DRPF ¶¶ VI–S, VI–U. Most if not all of Atlas's agents eventually did respond, and the policy went into effect on August 18, 1983. At the time the policy was announced, Atlas had approximately 490 agents, 91 of whom were carrier-agents. Following implementation of the new policy, 48 of the carrier-agents shifted their independent authority to separate corporations, 20 gave up their authority entirely but remained as Atlas agents, 12 were terminated by Atlas for failure to comply with the policy, and 11 chose to leave Atlas either to operate on their own or to become carrier-agents for one of the other national carriers. DSF ¶ 82; PSGI ¶ 82. In February, 1984, Atlas imposed on its reconstituted agents an enhanced system of fines to enforce its prohibition against shipment of non-Atlas hauls on Atlas-leased trucks, given that under the new arrangement, as noted, the use of Atlas's service and equipment infrastructure was intended to become restricted to Atlas shipments alone. *See* PSF ¶ VI–AA; DRPF ¶ VI–AA; Plaintiffs' Motion to Further Supplement Summary Judgment Pleadings, Attachment A (February 24, 1984).

Plaintiffs argue that the institution of the new Atlas policy represents a "boycott" of those Atlas agent companies that failed to comply, and that the Atlas policy constitutes price-fixing because it is aimed at preventing price-cutting by carrier agents in their independent capacities. As such, plaintiffs argue that Atlas's policy should be treated as a *per se* violation of the antitrust laws, and that even if the policy does not merit *per se* treatment, it nevertheless should be condemned under the rule of reason. Defendant responds by arguing that undisputed facts establish that 1) the institution of the policy is statutorily immune from the antitrust laws under 49 U.S.C. 10934(d), 2) *per se* treatment, as urged by the plaintiffs, is inappropriate, and 3) no violation under the rule of reason can be shown.

## II.

It is necessary at the outset to determine whether undisputed material facts make it possible to resolve this matter on the pending cross-motions for summary judgment. Under Fed.R.Civ.P. 56(c), a motion for summary judgment may be granted only when "there is no genuine issue as to any material fact and ... the moving party is entitled

---

**8.** *Compare supra* note 6, paragraph (d), where the ICC required a new pooling agreement.

**9.** Plaintiffs sought to have this determination reviewed in the Court of Appeals for this Circuit, but the appeal was dismissed by agreement without the Court of Appeals having ever reached the merits. *See Rothery Storage & Van Co. v. Interstate Commerce Commission*, Agreement That Proceedings Be Dismissed (D.C.Cir. Nos. 83–1210, 83–1361) (filed February 6, 1984).

to a judgment as a matter of law." It is well established that the undisputed facts and "inferences to be drawn" from those facts "must be viewed in the light most favorable to the party opposing the motion." *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962) (per curiam). To support summary judgment, the record "must demonstrate that [the] opponent 'would not be entitled to [prevail] under any circumstances.'" *National Ass'n of Governmental Employees v. Campbell*, 593 F.2d 1023, 1027 (D.C.Cir.1978) (quoting *Semaan v. Mumford*, 335 F.2d 704, 705 n. 2 (D.C.Cir. 1964)).

Courts have been cautioned to be especially careful about premature termination of a cause of action filed under the federal antitrust laws. *Poller v. C.B.S., Inc.*, 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962). Nonetheless, summary judgment may well be appropriate even in an antitrust action where a court has permitted extensive discovery and the requirements of Fed.R.Civ.P. 56(c) have been met. *See First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 289–90, 88 S.Ct. 1575, 1592–93, 20 L.Ed.2d 569 (1968). In this case, both parties have moved for summary judgment, and their respective statements of undisputed material fact demonstrate that plaintiffs and defendant are in substantial agreement on the essential facts making up the core of this case.[10] On the basis of these facts, the Court concludes that the motions for summary judgment are ripe for disposition.

### III.

In order to prevail on a claim under Section 1 of the Sherman Act, a plaintiff must show both 1) the existence of a "contract, combination ... or conspiracy," and 2) an unreasonable restraint of trade under either the *per se* rule or the rule of reason, as appropriate. Title 15 U.S.C. § 1 (1982); *see ABA Antitrust Law Developments* at 2 (2d ed. 1984). The undisputed facts dem-

onstrate that plaintiffs in this action cannot meet either of these criteria.

### A. Conspiracy.

Plaintiffs argue that a conspiracy to effectuate the Atlas policy in question existed 1) among the members of the Atlas board of directors, who voted to institute the policy, and 2) between Atlas and its agents in the field, who responded to Atlas's request for an indication of whether the agents would comply with Atlas's demands.

As to the alleged conspiracy among the members of the Atlas board of directors, it is firmly established that the actions of a corporation's board of directors do not constitute a conspiracy within the meaning of Sherman Act § 1. *See Copperweld Corp. v. Independence Tube Corp.*, — U.S. ——, 104 S.Ct. 2731, 2741 & n. 15, 81 L.Ed.2d 628 (1984); *Harvey v. Fearless Farris Wholesale*, 589 F.2d 451, 455 n. 7 (9th Cir.1979). A corporation, which can only function pursuant to the group decisions of the members of its board of directors, cannot in this fashion be found to have conspired with itself. *See Nelson Radio & Supply, Co. v. Motorola, Inc.*, 200 F.2d 911, 914 (5th Cir.1952), *cert. denied*, 345 U.S. 925, 73 S.Ct. 783, 97 L.Ed. 1356 (1953). An exception to this rule may exist, however, where individual members of the board of directors possess an independent personal stake in a particular action of the board, that is, where they act "on their own behalf." *Copperweld, supra*, at n. 15; *accord Smith v. Northern Michigan Hospitals, Inc.*, 703 F.2d 942, 950 (6th Cir.1983). Plaintiffs attempt to invoke this exception on the ground that Atlas's board of directors included the executives of some of Atlas's own agents and carrier-agents, which are separate corporate entities, independent from Atlas and from each other; plaintiffs argue that the new Atlas policies would necessarily affect both the Atlas and non-Atlas business potential of these separate companies in some fashion and thus give the agent companies on the board an

**10.** *See supra* note 2.

independent stake in whether the policy was adopted.

In an effort to illustrate and substantiate this claim, plaintiffs allege more specifically that one non-carrier agent represented on the board received a 2% royalty from Atlas for every shipment carried on Atlas's account within a certain geographic area, and thus stood to benefit individually from the adoption of the new policy because the new policy would predictably cause tonnage previously carried on the independent accounts of Atlas's carrier-agents to be shifted to Atlas's own account. Plaintiffs' Memorandum in Opposition to Defendant's Motion for Summary Judgment, at 10–12. Plaintiffs also observe that at least one carrier-agent represented on the board subsequently sought to benefit from the policy by competing more vigorously for the business of an agent that was experiencing difficulty complying with the new Atlas policy. *Id.* at 8–10. Thus, plaintiffs argue that in voting for the Atlas policy at issue, the executives of Atlas's agents and carrier-agents who served on Atlas's board had a sufficiently independent stake to render their participation in the decision a conspiracy within the meaning of the Sherman Act.

■ There exist two independently sufficient grounds for rejecting plaintiff's claim. The first is that even if the allegedly conflicting interests of some directors sufficed to trigger the "personal stake" exception, Congress has provided a special exemption from the antitrust laws that would preclude liability on account of the alleged agreement in question. Title 49 U.S.C. § 10934 provides, in pertinent part, that

d) The antitrust laws ... do not apply to discussions or agreements between a motor common carrier ... and its agents (whether or not an agent is also a carrier) related solely to ... (4) *ownership of a motor common carrier ... by an agent or membership on the board of directors of any such motor common carrier by an agent.*

(emphasis added). Defendant acknowledges that the agent companies represented on the board are separate entities from each other and from Atlas. Thus, the non-carrier and carrier-agents alike presumably possess at least some degree of interest in the success of their own companies, which on occasion may diverge from those of Atlas in general and other Atlas agents and carrier-agents individually. However, 49 U.S.C. 10934(d) does not retain any "personal stake" exception. Rather it expressly allows agents and carrier-agents of a van line to serve on the van line's board of directors, participate in its deliberations and decisions, and exercise responsibility for the affairs of the principal free of the risk of antitrust liability for doing so, despite their obvious status as independent entities with at least these basic independent interests. *See infra* note 11. The statute, moreover, specifically immunizes "discussions and agreements" regarding the "ownership of motor common carriers" by a van line's agents. The legislative history of this provision clarifies that it was intended to "immunize carriers and their agents from the antitrust laws with respect to certain dealings between them." S.Rep. No. 497, 96th Cong., 1st Sess. 8 (1979).[11] Congress's aim, in particular, was to

11. The relevant Senate Report language reads in full:

> There is also a provision in the act that immunizes carriers and their agents from the antitrust laws with respect to certain dealings between them. *This section is needed in order to permit the continued relationships developed and approved over the years of certain van line companies.* In some cases, van line companies are composed and owned by agents who themselves are carriers within limited geographical areas. In some cases,

the agents, as carriers themselves, have independent authority to operate in areas in which the principal carrier also may operate. Accordingly, in the absence of immunity, there could be some problems concerning immunity from the antitrust laws. The bill merely permits existing relationships to continue....

S.Rep. 497, 96th Cong., 1st Sess. 8 (1979) (emphasis supplied).

Analogous language in the House Report on this legislation reads:

"assure[ ] that discussions between a principal carrier and its agents related solely to [*inter alia* ] ... pooling or divisions between the principal carrier and its agents ... and ownership of a principal carrier by an agent ... are not discussions that would be in violation of the antitrust laws."

S.Rep. No. 497, 96th Cong., 1st Sess. 17 (1979). Discussion, voting, and agreement within the board on a policy announcing the terms that are to govern such ownership as well as the policy's implementation—as, it is undisputed, occurred in this case—seem to fall squarely within the language and intent of this statutory exemption. The exemption provision, it must be noted, was enacted into law as an explicit component of Congress's deregulation package. Thus, Congress may fairly be understood as anticipating discussions and agreements after deregulation which addressed adjustments of the pre-existing relationships to the new business environment. The material discussions and agreements at issue in this case related solely to whether "pooling" between Atlas and its agents would continue after deregulation, and, if not, to how the ownership of a principal carrier by an agent could be accomplished. Thus, the claim that the actions of the Atlas board of directors in this matter constitute a conspiracy within the meaning of the Sherman Act must be rejected. Congress appears to have expressly exempted the participation of agents and carrier-agents in the membership, deliberations, or agreements of a van-line's board of directors from the application of the antitrust laws where, as here, the subject matter of the discussions and agreements relates to the van line's policy with respect to the ownership of independent interstate authority by the van line's agents, including policies requiring change because of the business consequences of deregulation.

Plaintiffs argue that the statutory immunity works only in one direction: i.e., that § 10934(d) immunizes decisions *allowing* agents to acquire independent authority and *become* carrier-agents, but that it does not immunize a decision *abolishing* an existing carrier-agent arrangement. Statement of Points and Authorities in Support of Plaintiffs' Motion for Partial Summary Judgment As To Liability at 12–14. The Court is well aware that Congress sought to ensure that carrier-agent arrangements would not be prohibited as a result of deregulation. However, Congress did not command that they be preserved, nor prohibit their abandonment. Under plaintiffs' view of § 10934(d), national van lines that prior to deregulation had permitted their agents to operate as carrier-agents would essentially be locked into that arrangement, while those that had not allowed their agents to obtain independent authority from the ICC would presumably be free to continue that policy. Yet there is nothing in the legislative history to support such an arbitrary result; indeed, the legislative history appears, if anything, to reaffirm the right of a van line to enforce traditional agency standards of loyalty and

New section 10934 also contains a provision which immunizes from the antitrust laws certain discussions exercise [sic] agreements between carriers and their agents related to rates, charges, and allowances for transportation provided under the authority of the carriers. Further, such discussions and *agreements related to the ownership of a carrier by an agent or membership on the carrier's board of directors by an agent are immune.* The purpose of this provision is to allow the continuation of certain relationships between carriers and agents which have been established over the years. In some cases, the carriers are composed and owned by agents who themselves are carriers within limited geographical areas. In other cases, the agents, as carriers themselves, have independent authority to operate in areas in which the principal carrier operates. These relationships could be jeopardized in the absence of antitrust immunity. It is important to note that these exemptions are narrow ones. Specifically, the immunity provided by subsections (d)(1)–(3) applies only to discussions or agreements related to rates, charges, and allowances offered on traffic carried under the authority of the principal carrier. Similarly, subsection (d)(4) provides only a limited exemption. It does not exempt from the antitrust laws such things as anticompetitive mergers.

H.Rep. 1372, 96th Congress, 1st Sess. at 10 (1979) (emphasis added).

fiduciary duty upon its agents, as discussed below, and thus plaintiffs' argument must be rejected. *See infra* at page 232 & note 17.

█ Alternatively, plaintiffs' effort to establish that the actions of the Atlas board of directors constituted a conspiracy within the meaning and scope of the Sherman Act must also fail in that—even apart from the availability of statutory immunity—plaintiffs do not proffer evidence or demonstrate a reasonable prospect that they could proffer or prove specific facts sufficient to invoke the "personal stake" exception.

The antitrust laws look to substance, not to form. As noted, it may be inferred that each agent on the Atlas board of directors may well possess *some* independent interest in its own success apart from that of Atlas or its fellow agents, and that the benefits and detriments of the new policy may well accrue to each of them in a possibly distinct way. Yet other courts have observed that as long as employees or officers of a corporation have acted in accordance with their responsibility and authority to advance the interests of the corporation they serve—and where plaintiffs have failed to proffer specific facts to the contrary—no conspiracy within the meaning of the Sherman Act can be found. *See Green v. Associated Milk Producers, Inc.*, 692 F.2d 1153, 1156–57 (8th Cir.1982); *Nelson Radio & Supply Co. v. Motorola, supra,* at 914. In the leading case supporting the existence of a "personal stake" exception,

the personal interest in question was divergent from and possibly inconsistent with the corporate officer's responsibilities toward the corporation that the officer served. *See Greenville Publishing Co. v. Daily Reflector, Inc.,* 496 F.2d 391, 399–400 (4th Cir.1974) (cited in *Copperweld, supra,* at 2741 n. 15). In *Greenville,* the plaintiff alleged the existence of a conspiracy between a newspaper and the newspaper's own president to eliminate the plaintiff from the local newspaper advertising market. The Court held that a sufficient "personal stake" was alleged in that the president held a direct financial interest in yet another local newspaper that would benefit from the increased advertising that *it too* would gain as a result of the plaintiff's elimination. A newspaper president's interest in a completely unrelated paper is, on its face, wholly divergent from and possibly inconsistent with the president's presumed responsibilities toward the newspaper of which he is president. In the instant case, by contrast, the separate agent companies are part and parcel of Atlas's own network. Atlas's success is to a large extent dependent upon—rather than divergent from or inconsistent with—the success of its agent companies, either individually or as a group. And after voluminous discovery, plaintiffs have failed to proffer any facts showing that the agent and carrier-agent votes on the Atlas policy were grounded in interests that were inconsistent with or divergent from the overall best interests of Atlas itself.[12] The "personal

---

**12.** The insistence on such a showing is further supported by principles recently set forth by the Supreme Court's decisions in *Monsanto Co. v. Spray-Rite Service Corp.,* —— U.S. ——, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984), and *Copperweld, supra.* In *Monsanto,* the Court indicated that a finding of conspiracy could not be sustained on the basis of evidence merely "consistent" with illegal coordination between a manufacturer and its independent distributors. Rather, a plaintiff must proffer specific evidence "inconsistent" with the defense of unilaterality. *Monsanto, supra,* at 1473. An analogous distinction provided the basis of the decision in *Copperweld,* where the Court rejected the proposition that a corporation can conspire with its separately incorporated but wholly owned subsidiary. *Copperweld, supra,* at 2742–45. The Court

observed that "Coordination within a firm is as likely to result from an effort to compete as from an effort to stifle competition," *id.* at 2741, or, in other words, that the challenged behavior was, by itself, just as "consistent" with the "effort to compete," legitimately, as it was with the "effort to stifle competition." The Court thus seems to suggest that in such circumstances, the antitrust laws can only be triggered by proffering evidence of behavior "inconsistent" with otherwise legitimate purposes.

In the instant case, thus, the mere showing of a "personal benefit" traceable to an agent on the Atlas board of directors should not suffice to trigger the "independent stake" exception—assuming one exists—unless plaintiffs also proffer evidence showing that the personal benefit in

benefits" alleged—increased royalties due to increased Atlas traffic, and increased bases for competition with other Atlas agents—are wholly consistent with the unitary interests of Atlas and its agents to build a strong Atlas system. A stockholder/director of a company, for example, does not hold an impermissible personal benefit or act "on his own behalf" simply because his effort to advance the interests of the corporation would increase the value of his stock interest and the dividends paid to him. Here, similarly, careful evaluation of the facts proffered by plaintiff shows only that any advantage to the stockholder/director/agent was merely incidental to the advantage to the corporation, rather that inconsistent with or divergent from Atlas interests or with the Atlas agent/directors' responsibilities toward Atlas. *See also Card v. National Life Insurance,* 603 F.2d 828, 834 (10th Cir.1979). After considerable discovery, plaintiffs have not shown any reasonable possibility of proving otherwise. Plaintiffs, therefore, have failed to demonstrate any likelihood of proving the existence of a conspiracy within the Atlas board of directors or between the board and Atlas itself, for this reason as well as for the statutory immunity ground noted previously.

As to the alleged conspiracy between Atlas and its agents in the field, plaintiffs rely heavily on the fact that, soon after announcing its new policy, Atlas requested that its agents respond by indicating whether they would comply with the policy's terms. Plaintiffs contend that this

question was inconsistent with or divergent from Atlas's own competitive interests. There is a longstanding presumption that the members of a corporation's board of directors are incapable of conspiring with themselves under the Sherman Act in that there is no other way that a corporation can advance its competitive interests, *see Nelson Radio, supra,* and, thus, the Court is reluctant to find that the plaintiffs have demonstrated the existence of "the plurality of actors imperative for a § 1 conspiracy," *Copperweld, supra,* at 2741, without a proffer of evidence suggesting that the personal benefits derived from the board's actions were inconsistent with or divergent from the interests of Atlas itself.

communication represents negotiation or agreement, and as such satisfies the "conspiracy" requirement of their Sherman Act § 1 claim.

■ Again, there are two reasons for rejecting plaintiffs' claim. First, even if Atlas's communication with its agents did constitute an "agreement," such activity appears also to be immunized from the antitrust laws under 49 U.S.C. § 10934(d). As noted, that provision expressly immunizes "discussions and agreements" between a van line and its agents relating to "ownership of a carrier by an agent." Atlas's effort to determine the intentions of its agents in response to the announcement of its change in policy regarding the ownership of independent carrier authority by its agents falls squarely within the language and intent of the statutory exemption. *See supra* pages 226–228.

■ Alternatively, even apart from the availability of such statutory immunity, plaintiffs have not proffered facts sufficient to establish a vertical conspiracy. Plaintiffs have not demonstrated, nor does it appear that they can demonstrate, that Atlas's actions amounted to anything other than the unilateral announcement of a policy change and its subsequent implementation. The Supreme Court, in its last term, reaffirmed that "[a] manufacturer of course generally has a right to deal, or refuse to deal, with whomever it likes, as long as it does so independently." *Monsanto Co. v. Spray-Rite Service Corp.,* —— U.S. ——, 104 S.Ct. 1464, 1469, 79 L.Ed.2d 775 (1984). The same principle applies in a case such as this one.[13] As the analysis in

13. In *Spray-Rite, supra,* the Supreme Court confirmed the vitality of *United States v. Colgate & Co.,* 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992 (1919). As the Court explained:

Under *Colgate,* the manufacturer can announce its resale prices in advance and refuse to deal with those who fail to comply. And a distributor is free to acquiesce in the manufacturer's demand in order to avoid termination.

*Spray-Rite, supra,* at 1469. The *Colgate/Spray-Rite* doctrine applies to non-price terms of dealing—such as those in this case—as well.

*Spray-Rite* makes clear, plaintiffs here can only succeed in showing a conspiracy by offering specific, direct evidence inconsistent with the defense of unilaterality and indicating that Atlas and its agents had a "conscious commitment to a common scheme designed to achieve an unlawful objective." *Id.* at 1473. While plaintiffs demonstrate that Atlas kept in regular touch with its agents—informing them of the substance of the policy and seeking to elicit responses—such actions are wholly consistent with good management and planning. *Cf. id.* at 1470. Despite extensive discovery, on the other hand, plaintiffs offer no evidence inconsistent with the proposition that the policy announcement and implementation was a unilateral act on Atlas's behalf.

Plaintiffs, thus, have failed to demonstrate that the actions of the agents on Atlas's board of directors or in the field can in any way be deemed to constitute a conspiracy within the meaning or scope of Section 1 of the Sherman Act.

### B. Unreasonable Restraint of Trade.

Even if plaintiffs were able to satisfy the "conspiracy" requirement necessary to establish a Sherman Act § 1 violation, plaintiffs would still have to establish that Atlas's policy constituted an "unreasonable restraint of trade." Plaintiffs stress that the immunity granted by Congress with the enactment of 49 U.S.C. § 10934(d) was meant to be a "limited" one and was not intended to protect "such things as anticompetitive mergers," H.Rep. 1372, 96th Cong., 1st Sess. 10 (1979). Plaintiffs argue that the competitive restraint imposed by the Atlas policy must therefore be evaluated in any event to determine whether it might fall outside of the immunity provision's intended scope.

Assuming, *arguendo*, that a conspiracy has been demonstrated and that no statutory immunity applies, the Court would next have to determine whether to apply "per se" treatment to the evaluation of the practice in question, as urged by plaintiffs, or whether to apply the "Rule of Reason," as urged by defendant.

### 1) Per se treatment.

Plaintiffs contend, as indicated above, that the institution of the new Atlas policy represents a "boycott" of those Atlas agents who refused to comply with the policy, and that it also represents a "price-fixing" scheme, in that it is allegedly aimed at preventing price-cutting by carrier-agents in their independent capacities.[14]

Boycotts and price-fixing schemes, when proven, have often been accorded *per se* treatment.[15] Nonetheless, the Court of Appeals of this Circuit has warned that

A *per se* rule is a judicial shortcut; it represents the considered judgment of courts, after considerable experience with a particular type of restraint, that the rule of reason—the normal mode of analysis—can be dispensed with. As the Supreme Court explained in *Northern Pacific Railway Co. v. United States*, "there are certain agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the

---

**14.** Plaintiffs theorize that the new policy tended to cause either of two outcomes: 1) agents abandoned or failed to seek independent authority under which they might have charged lower prices for moving services comparable to those that they were providing as Atlas agents, or 2) agents transferred their independent authority to separate corporations, and the additional cost of doing so dampened their ability to charge lower rates on the independent shipments.

**15.** As noted, it is typical in the moving industry for the agents of a van line to enter into exclusive dealing agreements with the van line; i.e., they agree not to provide van line services to any company that is not also an agent of the van line that they serve. Plaintiffs argue that this practice should in this case be treated as an antitrust violation because it is an integral part of Atlas's alleged boycott and price maintenance schemes. Though exclusive dealing arrangements are traditionally treated under the Rule of Reason, plaintiffs contend that here they should be treated as part of Atlas's other *per se* violations.

precise harm they have caused or the business excuse for their use." A court will not indulge in this conclusive presumption lightly. Invocation of a *per se* rule always risks sweeping reasonable, pro-competitive activity within a general condemnation, and a court will run this risk only when it can say, on the strength of unambiguous experience, that the challenged action is a "naked restraint[ ] of trade with no purpose except stifling of competition."

The Supreme Court emphasized the "demanding standards" of *Northern Pacific Railway* last term in *Continental T.V., Inc. v. GTE Sylvania Inc.* Reiterating that *"[p]er se* rules of illegality are appropriate only when they relate to conduct that is manifestly anticompetitive," the Court overruled *Arnold, Schwinn & Co.*, which had held certain vertical restraints illegal *per se.* The *Continental* Court noted that the vertical restrictions in question possessed "redeeming virtues" in their stimulation of inter-brand competition; that the restrictions were "widely used in our free market economy"; and that there existed "substantial scholarly and judicial authority supporting their economic utility." For these reasons, the Court held that the restraints at issue were to be analyzed not under a *per se* rule, but under the rule of reason.

*Smith v. Pro-Football,* 593 F.2d 1173, 1181 (D.C.Cir.1978) (footnotes omitted).

In *Smith v. Pro-Football,* the Court of Appeals refused to apply the *per se* rule in its evaluation of the NFL player draft. In this case, the Court similarly declines to apply the *per se* rule in evaluating Atlas's response to the changes accompanying deregulation of the household goods moving industry. Deregulation abruptly re-organized the rules at the foundation of the moving industry. Analysts are still examining the impact of these changes. *See* Plaintiffs' App. P, Q. No court has apparently yet closely analyzed the unique nature of the business relationship between van lines and their carrier-agents, at least as the relationship affects the carrier-agents' exercise of their independent authority.[16] "Considerable" and "unambiguous" experience with the practice at issue is a necessary prerequisite for application of *per se* treatment, and the Court finds that—given the unusual nature of the van line/carrier-agent relationship, and given the general confusion following deregulation—such experience is simply absent in the present case. Moreover, the Atlas policy allows agents the option of retaining their independent authority in separate companies, or becoming carrier-agents of a different van line, and thus the Court is reluctant to term the policy as "pernicious." Also, it simply cannot be accepted that the new Atlas policy has "no purpose except the stifling of competition" or that it is without "any redeeming virtue." Plaintiffs cannot reasonably dispute that Atlas was fully within its rights when it terminated its pooling agreement, or that Atlas's new policy will enhance inter-carrier competition among the national van lines, as explained below. Finally, it is worth noting that the new Atlas policy represents nothing more than the adoption of a method of operation—exclusive agency—that is "widely used" not only in the van line industry, but throughout commerce. In sum, the Court finds that the "demanding standards" for application of *per se* treatment have simply not been met. Rather, "the courts have had too little experience with this type of restraint, and know too little of the 'economic and business stuff' from which it issues, confidently to declare it illegal without undertaking

---

**16.** *Cf. North American Van Lines, Inc., v. I.C.C.,* 666 F.2d 1087, 1094–96 (7th Cir.1981) (van line challenge against ICC regulations implemented after deregulation) ("There was no evidence before us regarding the customary arrangements ... between national carriers and their agents."); *Clemmer v. North American Van Lines, Inc.,* 1969 Trade Cases ¶ 72,936, at 87609 (E.D.Pa.1969) (van line's allocation of exclusive territories between agents deemed not in violation of the antitrust laws) (policy in question did not affect carrier-agents' independent shipments).

the analysis enjoined by the rule of reason." *Id.* at 1182 (footnote omitted).

### 2) *Rule of Reason.*

■ Plaintiffs argue that the initiation of Atlas's new policy can be condemned even under the rule of reason. Guidance may once again be taken from the opinion of the Court of Appeals of this Circuit in *Smith v. Pro Football, supra,* where the Court of Appeals stated that:

> Under the rule of reason, a restraint must be evaluated to determine whether it is significantly anticompetitive in purpose or effect. In making this evaluation, a court generally will be required to analyze "the facts peculiar to the business, the history of the restraint, and the reasons why it was imposed." If, on analysis, the restraint is found to have legitimate business purposes whose realization serves to promote competition, the "anticompetitive evils" of the challenged practice must be carefully balanced against its "procompetitive virtues" to ascertain whether the former outweigh the latter. A restraint is unreasonable if it has the "net effect" of substantially impeding competition.

*Id.* at 1183.

This memorandum has already described the "facts peculiar to" the van line and moving industry, and the recent legislative and regulatory changes leading to the new Atlas policy. Prior to deregulation, Atlas had given its carrier-agent companies permission to use the Atlas infrastructure to compete with Atlas itself, for their own accounts, within the boundaries set by federal regulations and ICC oversight. Classic agency law, however, gives a principal the prerogative of withdrawing such permission if convenient to protect the principal's interests. *See* Restatement of Agency, Second §§ 1(1), 14N, 393–394. Nothing in the legislative history of Congress's deregulation of the household moving goods industry suggests that when Congress removed the regulatory restrictions on carrier-agent independent operations, it added a restriction barring van lines from exercising this prerogative. Indeed, the legislative history of the measure shows just the opposite: that Congress had no intention of disturbing the ability of a van line to reach agreements enforcing "the fiduciary duty of loyalty of an agent not to compete with its principal concerning the subject matter of the agency." S.Rep. 497, 96th Cong., 1st Sess. 8.[17] Congress may well have speculated that by widening the regulatory boundaries on carrier-agent independent operations, it would have triggered more independent operation of that sort. However, when it lifted those restrictions, it did so—consistent with the free market philosophy supporting deregulation in general—to create an *option,* not a *mandate.*[18]

---

**17.** The Senate Report discussion of this matter reads in full:

> During the course of its deliberations, the Committee considered a proposal to include within the immunity section language that would grant immunity to agreements concerning exclusive agency representation, or the fiduciary duty of loyalty of an agent not to compete with the principal concerning the subject matter of the agency. The Committee determined that this type of relationship is not a violation of the antitrust laws and is standard agency law as expressed in section 393 of the Restatement of the Law of Agencies section. The Committee felt that inclusion of such language could imply that such relationships are a violation of the antitrust laws in the absence of immunity. Thus, the Committee determined not to include such language in the bill.

S.Rep. 497, 96th Cong., 1st Sess. 8 (1979). Neither party makes any issue of the portion of this passage explaining that "the Committee determined not to include" language in the bill that might have immunized exclusive agency or fiduciary duty agreements directly. Thus, it is not necessary to resolve any questions that might arise from the fact that such language was consciously excluded. However, the Court is inclined to agree with the observation of the Senate Committee that "this type of relationship is not a violation of the antitrust laws," *id.* *Cf. Delta Data Systems Corp. v. Webster,* 744 F.2d 197 at 201–202 (D.C.Cir.1984) (valid to consider GAO report as persuasive even if not binding).

**18.** The House Report on the legislation states, under the heading "Section 2. Declaration of Policy," that:

> Section 2 sets forth congressional policy with respect to the household goods moving indus-

Congress, thus, left each individual van line free to fashion its own response to deregulation—or, in Atlas's case, to the prospect of widescale price competition from its own agents using the van line's own infrastructure. Atlas's choice was to protect against the further diversion of its own business infrastructure in this fashion, and instead to strengthen its competitive position by returning to a traditional agency arrangement whereby its agent companies serve Atlas alone. As such, the new Atlas policy plainly had a legitimate business purpose, and is consistent with policies chosen by Congress with respect to the choice between regulation and competition in this industry.

In an effort to identify the "anticompetitive evil" of the challenged practice, plaintiffs stress that, upon the implementation of the new Atlas policy and the resultant withdrawal of access to Atlas services and equipment for use on independent shipments, several carrier-agents ceased their independent operations entirely. Others adapted by shifting their independent authorities to separate corporations or abandoning Atlas to become carrier-agents for some other major van line, and plaintiffs adduce facts showing that these latter groups of agents incurred significant expense in doing so.

One of the basic tenets of the federal antitrust laws, however, is that they are intended to protect *competition,* not *competitors. Copperweld, supra,* at 2740 n. 14. The Court must look not to whether individual agents incurred losses as a result of the new policy, but rather to the extent to which the Atlas policy somehow impeded the opportunity of Atlas agents to utilize their independent authority in the market for moving services. On this score, it is necessary to reiterate that the new Atlas policy does not absolutely bar an

Atlas agent from exercising independent interstate authority. The agent company itself must serve Atlas alone, but agents *may* exercise independent authority if that authority is placed in an affiliated but commercially separate company. Because the separate company must develop its own service and equipment infrastructure, the true effect of the Atlas policy is, in essence, only to prevent agents who do exercise independent authority from appropriating to themselves any aspect of the Atlas network for the support services and overhead equipment necessary to operate that interstate authority beyond any great distance. The new arrangement essentially terminates a subsidy previously available to an Atlas carrier-agent at the expense of Atlas. At the same time, agents who wish to continue to operate as "carrier-agents" are not barred from seeking to join one of the other van lines that do subsidize carrier-agents in this way. Thus, the only enduring anticompetitive harm demonstrated by the plaintiff is the loss of the opportunity to continue to operate in a traditional carrier-agent relationship with Atlas itself.

In reaching this conclusion, the Court has not overlooked the fact that Atlas has also required its carrier-agents to refrain from transferring their established names as Atlas agents to the corresponding non-Atlas affiliate companies created as a result of the carrier-agents' compliance with the Atlas policy. In any given case, this requirement bars the new, non-Atlas entity from access to the goodwill—as it is represented in the carrier-agent's established name—that has been built up as a result of the carrier-agent's *Atlas* relationship. At the same time, though, it also deprives the independent entity of any goodwill that might have been fairly allocable to *it* due to the carrier-agent's own independent operations. *See* DSF ¶ 58; PSG1 ¶ 58. The

try. The emphasis in the policy statement is threefold—*the reduction of unnecessary regulation,* the strengthening of consumer remedies and protections, *and the establishment of maximum carrier flexibility* in pricing their services and meeting the needs of their shippers.

H.Rep. 1372, 96th Cong., 1st Sess. 5 (1979) (emphasis added). *See also* S.Rep. 497, 96th Cong., 1st Sess. 8 (1979) ("The bill merely *permits* existing [carrier-agent] relationships to continue." (emphasis added)).

reasonableness of this feature of the Atlas policy may be viewed differently by different courts. It passes muster here because plaintiffs have not proffered evidence that would indicate the relative burden that Atlas would have borne had it permitted its carrier-agents to transfer their established names to the new, non-Atlas entities, if the agents had so wished, as opposed to requiring its carrier-agents to give the new entities different names instead.[19] Indeed, even if there were such evidence, it would necessarily be speculative. And in addition, each carrier-agent, as noted, had the clear option of operating completely independently, or of seeking to associate with another van line that would permit carrier-agent or independent operations under that name.

In judging the reasonableness of the Atlas policy, it should be noted that plaintiffs appear to have conceded that a van line is fully entitled to abandon its agency network altogether, or choose to operate exclusively with agents that have no independent interstate authority at all—i.e., no independent interstate authority either within the agency company or within a separate, affiliated company. *See* Transcript of Hearing, August 6, 1984, at 19–23. At least one major van line other than Atlas does indeed operate in such a manner.[20] The arrangement now being enforced by Atlas, however, is one that is *less* extreme. Agents are expressly *permitted* to contin-

ue to operate their own, independent authority as long as it is located within an "affiliated" but separately incorporated company. The Court of Appeals for this Circuit faced an analogous situation in *United States v. Studiengesellschaft Kohle*, 670 F.2d 1122 (D.C.Cir.1981). That case involved the holder of a process patent who had granted licenses to several manufacturers, allowing all of them to use the process to produce products for their own use but allowing only one of them to sell the resultant product in the open market. The plaintiff manufacturers challenged this "restraint." The Court of Appeals however, noted that the patent-holder was legally entitled to grant an exclusive manufacturing and sales license to a *single* licensee if he so desired, and that therefore, the patent-holder could not be deemed to have acted "unreasonably" under the antitrust laws for having taken the less extreme step of licensing additional manufacturers subject to the condition that the resultant product be restricted to their own use. *Id.* at 1128–31, 1135. Similarly, if Atlas would be entitled to choose to continue doing business only with agents that possess no interstate authority whatsoever, then Atlas would presumably be entitled—without being found to have acted unreasonably—to take the less extreme step represented by the Atlas policy in question.[21] *See also Red Diamond Supply, Inc. v. Liquid Car-*

---

19. It is worth noting, in this regard, that one other major van line has determined to accept the costs of permitting its carrier-agents to shift their established names to such newly created separate entities. *See* DSF ¶ 79. Counsel for the defendant may themselves yet decide, out of an abundance of caution and in anticipation of a possible appeal, to recommend to Atlas the adoption of this more conservative approach.

20. Plaintiffs themselves report that "Allied Van Lines, the largest van line, allows no firm affiliated with it to have or to use authority to conduct interstate operations competitive with its own. This arrangement was approved and immunized from the antitrust laws by the Interstate Commerce Commission in 1946, following an antitrust action suit brought by the Justice Department. *Evanston Fireproof Warehouse, et al.,—Control—Allied Van Lines,* 46 M.C.C. 557 (1946)." PSF ¶ III–I.

21. The court does not itself face the question, nor intimate any ruling, on whether indeed it would be valid under the antitrust laws for a van line to take the more extreme step of banning its agents even from having separate affiliates exercise independent carrier authority. Suffice it to note that plaintiffs, having *conceded* that a van line is entitled to take such extreme action, *see* Transcript of Hearing, August 6, 1984, at 19–23, are in no position to argue that Atlas's less extreme action is unreasonable. Given that Atlas bars only the exercise of independent authority by the agency companies themselves, the policy goes no farther than is necessary to enforce traditional agency standards upon the agent companies alone. The discussion above demonstrates the reasonableness of a policy that is limited in this fashion.

 

*bonic Corp.*, 637 F.2d 1001, 1006–07 (5th Cir.), *cert. denied*, 454 U.S. 827, 102 S.Ct. 119, 70 L.Ed.2d 102 (1981). Rather than choosing to do business only with agents who have no independent authority whatsoever, Atlas *allows* its agents to possess independent authority as long as they place it in a separate company and look elsewhere than to Atlas for the support and overhead services necessary to utilize that authority. It is difficult to regard this tempered action as "unreasonable" within the meaning of the Sherman Act, or to see what other proof plaintiffs could muster to change this conclusion.

Finally, to the extent that Atlas's policy has any legally cognizable anticompetitive effect, there stands balanced against it the plain and significant procompetitive impact on competition among the national van lines. Plaintiffs do not dispute in any material way that enforcing traditional agent loyalty upon Atlas agents will strengthen Atlas's competitive position vis-a-vis the other national van lines, particularly those that already require their agents to work with them alone. Plaintiffs concede that carrier-agency reduced the amount of traffic carried on Atlas's account, PSGI ¶ 22, and cannot plausibly argue that carrier-agency did not or would not expose Atlas to increased liability—at least to some extent—for shipments carried out under Atlas's actual or *apparent* authority. *See* PSGI ¶¶ 31–34. Atlas's new policy eliminated these competitive vulnerabilities, and thus, as shown above, had a legitimate business purpose with a plain procompetitive effect. Therefore, considering the nature and overall competitive effect of the announcement and implementation of the new Atlas policy, the Court finds from undisputed facts that plaintiffs are unable to show that Atlas's actions violated the rule of reason.[22]

## IV.

For the foregoing reasons, the Court concludes as a matter of law from undisputed material facts that defendant's actions in requiring its agents to refrain from independent carrier operations, except through separate corporate affiliates, does not violate Section 1 of the Sherman Act. Accordingly, an accompanying order will deny plaintiff's motion for partial summary judgment as to liability, and will grant defendant's motion for summary judgment.

---

22. To the extent that plaintiffs' claims also challenge Atlas's earlier, aborted efforts to cope with the advent of deregulation, *see supra* note 6, the Court similarly finds that no violation of the rule of reason can be demonstrated. Even apart from whether the "conspiracy" requirement can be met as to these earlier Atlas ac-

tions, the Court finds that their short duration, the prerogative of Atlas to impose traditional agency standards upon its agents, and the procompetitive aim of the actions establish that they cannot be deemed "unreasonable" under the Sherman Act.